BURCH *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAIL-
WAY COMPANY.

Opinion delivered May 26, 1913.

1.  RAILROADS—INJURY TO PERSON ON TRACK—DUTY TO TRESPASSER.—
Under the act of 1911, p. 275, which requires railroads to keep a
constant lookout for persons on the track, a railroad company
owes to a trespasser on the track a duty to keep a constant look-
out to avoid injuring him, and contributary negligence on the
part of the person on the track will not excuse the failure of the
railroad to exercise this duty, where if such lookout had been
kept, his perilous position could have been discovered in time
to have prevented the injury by the exercise of ordinary care.
(Page 407.)

2.  RAILROADS—INJURY TO PERSON ON TRACK—NEGLIGENCE QUESTION FOR
JURY.—Where deceased was run over and killed by a railway
engine, it is a question for the jury as to whether the railway
employees, exercised the degree of care required by the statute
in keeping a lookout.   (Page 407.)

3.  RAILROADS—DEATH—RECOVERY FOR PAIN AND SUFFERING.—Where de-
ceased is instantly killed by being run over by a railway engine,
there can be no recovery for pain and suffering for the benefit of
the estate of the deceased.   (Page 408.)

Appeal from Lawrence Circuit Court, Eastern Dis-
trict; *R. E. Jeffery,* Judge; affirmed.

STATEMENT BY THE COURT.

J. T. Burch brought suit, as administrator, for dam-
ages for the death of his intestate, R. L. Burch, alleged
to have been wrongfully caused by the negligence of the
railway company.   It was alleged that the deceased was
a licensee, and on November 17, 1911, while in the dis-
charge of his duty as a lineman for the telegraph com-
pany, put his speeder upon the railroad track in front of
the station at Hoxie, for the purpose of going south, look-
ing after the telegraph wires.   That after he had gone
about 150 yards, the employees of the railway company,
while running an engine backward in the direction he was
traveling, ''and without keeping proper lookout for per-
sons upon its tracks, as required by law, and without re-
gard for the life and welfare for plaintiff's intestate, and
without sounding proper alarm, or giving proper signals,

ran down and over the deceased, wounding and injuring him, from which he suffered great physical pain and mental anguish, and from which injury he died in a short time on the same day." Alleged as an element of damages, funeral expenses in the sum of $250, and asked damages for the estate, both actual and exemplary.

The defendant denied the allegations of the complaint; that deceased was a licensee upon its tracks, and that its agents and servants failed to keep a proper lookout for persons upon its tracks, or to give the proper signals and alarms as required by law, as alleged. Denied specifically each allegation of negligence, and plead contributory negligence and assumption of risk of the deceased in bar of the action.

R. L. Burch was a lineman for the Western Union Telegraph Company, and was killed by being run over by the tender of an engine backing south on the appellee company's tracks at Hoxie, on November 17, 1911. He got off of a passenger train, took his speeder off of the train, put it on the track and started south; the train ran on up to the switch, backed the coaches in on the switch and the engine pulled out on the main line, backing south, the direction in which Burch was going. He looked around before the engine struck him, threw up his hands twenty or thirty steps from the engine before he was struck and run over. The testimony is conflicting as to the speed of the engine, it being estimated all the way from eight to thirty-five miles an hour, some of the witnesses saying it was going about twice as fast as the speeder, upon which Burch rode. There was testimony showing that signals for the crossing of the Frisco railroad were given, and that the engine was brought to a standstill, or virtually so, before crossing it, and that shortly after making this crossing, it ran over and killed the deceased. The engine was in charge of a hostler and his helper, who had relieved the crew upon the arrival of the train at Hoxie, and the hostler, an old engineer, stated that Burch was killed while he was backing the engine back to the pit in the yards, after having put the coaches in on the siding. That after they cut loose and

pulled out onto the main line, the helper got off at the Frisco crossing; that he looked up and down the track, east and west, saw no trains, and upon the signal from the helper, continued on down south; that he went across the crossing slowly and by the depot, and opened up the engine, and was going faster as soon as he got past the depot, and the Van Noy's building, where the sound would not be so annoying. That he whistled for the dirt road crossing south of the depot some seventy-five yards south of the wye. His attention was attracted to an old woman on the dirt road approaching the crossing, who seemed to be old and infirm. That he did not see Burch on the speeder at any time at all, and supposed he must have gotten on the track when he was looking up and down the Frisco track, when the engine was at a stand-still before crossing. That Burch was killed before he knew there was any one in danger. He heard a voice over by the bank building, and his hand was on the brake valve, and he instantly put it in the emergency, and he had cut off the steam about that time, or before he heard the sound and shut the throttle off. That there was absolutely nothing else that could have been done to stop the engine after he heard the voice of distress, indicating danger. When he put his head out of the window before the engine came to a stop, he saw the wreck of the speeder and the man. He was the first man to reach Burch, and said, "I found him killed and pretty badly mangled. I saw a slight movement of his head. He didn't speak or breathe that I heard or saw." It was a cloudy day and raining, and the wind was blowing from the south. The engine was going about eight miles an hour. Witness thought he was not able to see deceased, because he was on the track so close behind the tender, which obscured him from view. That he could not see a man less than fifty feet in front of the engine's tender.

Tom Lewis, the helper, testified that he was on the engine; that they took the train to the north wye and cut the engine off and came back down the track; that he got off the engine and flagged the crossing; that the engine stopped before reaching the crossing about thirty-

five or forty feet; that it was a rainy day and the wind was blowing from the south; that the whistle was sounded twice; that he was on the rear of the tank, swinging back at arm's length from the hand rail, west from the tank and on the left-hand side, with the engine moving backward, going south, standing in the stirrup; that he ran down to the crossing and didn't see anything; looked both ways on the Frisco, and then, with his face toward the engine and his back to the south, he signalled the hostler to come on across, which he did. That he got on the engine and looked down toward the Iron Mountain yards, and did not see anything. That he got down about the Van Noy building and looked down the track again and did not see anything and never did see Burch until he was within about two feet of him. Burch was flagging with his left hand and pulling the speeder with his right, and made an attempt to get off. He threw up his leg, like he had started to get off, and the engine struck him at that time. That he hallooed and signalled the hostler to stop as soon as he saw Burch and the hostler put on the air-brakes. He said that after he looked down the Iron Mountain track at the crossing he turned, and looked up and down the Frisco, and then, with his face toward the engine, signalled the hostler to come on across and caught the left-hand side of the tank and remained in that position until Burch was struck. "It was raining very hard and the wind was blowing in my face, and I had on a rain hat, and it would kind of blow off, and I could not hold my head up is about the only reason that I could give why I couldn't see Burch. The engine whistled two blasts at the Frisco crossing, and then whistled for the dirt road crossing two longs and two shorts is all the sounds, I believe."

Several witnesses saw the occurrence and one testified that Burch was on his speeder going south. He saw the engine before it hit him, looked around, threw his hands up about twenty or thirty steps from the engine before it struck him. The engine was going pretty fast, witness thought about twelve or fifteen miles an hour. He also heard some one halloo, but didn't know whether it

was Burch or some one on the engine. When the engine struck him, he ducked right down on the inside of the tracks. Part of the speeder was on one side and part of it on the other. It was torn up. Witness stated he was about seventy-five yards away. When he got to deceased, he was gasping and threw his head back with his mouth open, but witness did not hear him say anything. The train was stopped in about forty feet after it passed over him. This witness said the whistle was sounded before the Frisco crossing was passed, but not afterward, that he heard. It was about 156 yards from the switch where the cars were placed to the Frisco crossing and about 150 yards from the Frisco crossing to where Burch was killed.

Burch came up on the train, the engine of which killed him, and took his speeder off the train when it went up to the switch track to switch the coaches. He went into the depot to get some kind of papers, and came back out to put his car on the track just a few seconds after the train went up, and when the engine was up near the switch, according to this witness, who also said that a man could take off and put the speeder on the track by himself. He did not see Burch when he put the speeder on the track, and did not know whether any one helped him or not. The first he noticed him was as the train came across the crossing, and a little boy, standing near, said: "If that fellow don't look out, he is going to get hit by that train," and the train kept going on, and hit him. "I believe the train blowed two whistles before it got to the crossing. I was about 100 yards from him, and Burch was about fifty yards ahead when it whistled; about even with the Van Noy door, something like that." He thought a man could have lifted a speeder off from the time the whistle sounded at the crossing before it struck him, if he had heard it. He was about twice as far from the engine as Burch was. This witness said the engine did not come to a stand-still at the crossing, but slowed down. He ran immediately to the injured man who didn't speak, "but just kinder raised his head

and gasped.'' The engine didn't slow up. He said Burch didn't have time to get the speeder off the track after he threw up his hands and before it struck him.

Another witness, watching the occurrence, saw the man get on the speeder near the baggage room and start off down the track, south. The engine was above the crossing at that time, and when it got near the man going south on the main track, he kept looking at him, supposing he was some railroad man that knew his business, or that the men on the engine knew he was there. The engine got nearer and nearer, and when they were nearly on him, Burch threw up his hand, and it wasn't but a minute until he was under the tender. This witness thought Burch would have had time to have gotten off the track between the time the engine was at the Frisco crossing and the time it struck him. It was about 100 yards below the crossing where he was struck. That you could see a man down the track as far as you could see. That there was nothing to prevent the employees of the engine from seeing him, except the tender, that they would have to look over. That the engineer might not have been able to have seen right close up in front of the tender. That he could have seen Burch from the Frisco crossing. That Burch, if he had been looking back, could have seen the engine approaching. That he was going the other way from it, south.

Another witness said he was fifty yards away on the west side of the track, and saw Burch before the engine struck him. He was on the speeder, and looked like he was trying to get off of it. He was throwing up his hands and hallooing. The engine was pretty close to him then, in fact, it was right on him. The engine was going pretty fast, and it didn't slow up from the time he threw up his hands until it hit him. That it ran over him and knocked the speeder out from under him. That he heard some one halloo when it first struck him.

Arthur Hudson, a witness for the plaintiff, testified that he was 100 yards away from the baggage room, in front of Reed's restaurant, and thought the engine was

going fifteen miles an hour. That Burch discovered the approach of the engine about thirty or forty feet before it hit him. That he threw up his hands and hallooed. That he heard some one halloo after the engine struck him, but he didn't know whether it was Burch or not. It was a sort of a scream. That he saw the deceased when he got on the speeder at the baggage room. The **engine** was above the crossing then, and there was no alarm sounded just before it struck him. It whistled two little short whistles for the crossing. He did not see it stop for the crossing. Did not notice Burch until after he got on the speeder, and did not see him put it on the track. He named several others who were standing there. That he had come up that morning on the train from Alicia. He could not see that Burch made any effort to get off of the speeder. Other witnesses testified that he would have had time to fall off the speeder twice before the train reached him after he discovered the engine approaching.

Thomas Henry testified: "I saw Burch put his speeder on the track and start off, and I saw the engine at the crossing. He put his speeder right on in front of the engine. The engine had stopped for the crossing, when this man, Burch, put his speeder on the track, and started off. Then the helper highballed the hostler, and the engine came on and the helper caught the handle on the back end of the tender, and when the engine came even with me, it whistled for the crossing, when Burch was three or four rails in front. He turned back and saw the engine, and hallooed 'Help,' and pulled the speeder with his right hand and threw up his left hand. The engine was so close on him, I couldn't tell whether he threw his leg up or not. It hit the speeder, knocked it from under him, and threw him across the rail."

In reply to a question as to whether or not deceased had time to get off the speder, after he saw the engine, witness said: "Well, it looked to me like he could have fell off of two speeders in that time."

On cross examination, he said: "When the engine

crossed the Frisco, it was five or six rails from Burch. A rail is forty foot, I think. Burch was at least 200 feet from the engine, maybe further. He was. south of. the restaurant at that time. I suppose he travelled six rails further before he was struck. The engine was going about twice as fast as the speeder. The engine was within three. rails of him when he threw up his hands. He went a rail-length and a half, maybe two, after that. The engine did not slow up after he hallooed and threw up his hand." "That he was within 100 yards of Burch when he was struck, and ran to him. He was drawing his eyes and kinder working his head, and the way he was working his mouth, I just put it up that he was trying to say something."

Another witness said that he saw the man on the speeder, maybe sixty or seventy feet in front of the engine and in. a moment, he saw him look back. That he began to wave at the engine, and he could see no one in the fireman's cab on the engine. This witness thought Burch was going to catch hold of the engine, and let it push him on into the yards. He threw up his hand again. It was set stiff; then the tender seemed to set the speeder in the middle of the track, and he doubled up under it. He made about one stroke with the speder lever. When he came out from under the engine, it had just doubled him up in a pile. He was about sixty-five or seventy-five yards from him, and ran to him and he just raised his head and gasped. Burch was about sixty feet from the engine when he waived his hand. This witness thought he could have had time, unless the fright paralyzed him, after seeing the engine coming to have gotten out of the way. He also said the speeder was going about as fast as the engine, when he first noticed the engine, about as fast as a man could trot. That he did not see the speeder put on the track.

William Hayden, a witness for the defense, saw Burch get off the train the day he was killed, and assisted him in unloading his speeder and tools, as he worked the express off the train that day. "He turned to me and

asked me if he would have time to make it down before the next train. I told him, 'I wouldn't try it.' He said, 'I can make it to the switch.' He loaded the speeder and tools and started. I went back into the express room. I heard the engine pass, and I ran out, because I knew Burch was on close. I didn't get to see him, for the engine got between me and him. I saw him come out from behind the engine. The train was up at the wye when Burch asked me about the next train, and I told him I wouldn't try to make it."

One witness for the plaintiff testified that he was on the east side of the track coming from the south end of Hoxie in a top buggy; that he saw the engine about 100 feet south of the Van Noy restaurant, and it smoked like the brakes might be on, and when he reached the tracks, he saw the body of a man who had been killed, and learned it was a lineman who had been run over and killed. Had had twenty-two years' experience in the locomotive department of the railroad companies, and five years running an engine, and, in his best judgment, the engine was running between eight and ten miles an hour. He didn't see the man on the speeder on the track, but there might have been something to obstruct his view. That he was within 140 feet of the Frisco crossing, and that the body was about fifty feet north of this road crossing on the track.

It was also in evidence that railroad trains have the right-of-way over the speeders, except when the speeders are running as specials on a schedule, and persons on speeders are supposed to flag trains and keep out of the way of them.

Dr. J. E. Pringle, a local surgeon for the Iron Mountain, at Hoxie, reached the injured man within five minutes after he was struck, and found him dead. The engine and tender had run over him about the hips, and cut him nearly in two. He was of the opinion that the shock was so great that it rendered him absolutely insensible to pain. "The extent of the shock seemed to be complete. I do not think this man could have been conscious

of any pain. Assuming that he raised his head and gasped two or three times after he was run over, I would say he suffered no conscious pain from the injury received.''

Doctor Vasterling, a witness for the defendant, and chief surgeon for the Missouri Pacific Railway Company since July, 1909, and in charge of the hospital department in St. Louis for twenty-two years, answering a hypothetical question as to the injury, stated that, in his opinion, the man was instantly killed; that the movement of the head and gasps was no more than the relaxation of the muscles.

The court directed a verdict as follows: ''Gentlemen of the Jury, the case which is now submitted to you and which is being tried, the case of Burch against the railroad, will at this time be withdrawn from you, because, under the law, in my judgment, there is not sufficient showing on the part of the plaintiff to show liability on the part of the railroad company. There is no evidence, to my mind, that the deceased exercised proper care to take care of himself, and to escape, as shown here. He is a licensee of the railroad company by reason of his association in the capacity of lineman, and, having that right, the law required him to keep a lookout to avoid danger, unless the railroad, in the absence of his keeping a lookout, discovered him in time to avoid the injury, the railroad company would not be liable on account of failing to keep a lookout.

''So, under the law, there is not sufficient showing on the part of the plaintiff to warrant a finding for the plaintiff in this instance. It is unfortunate that a human being should be killed in this manner, but, since the law requires a certain showing made before the railroad company can be liable for it; and, in the absence of such showing, I will instruct you to return a verdict for the defendant.''

From the judgment thereon, this appeal comes.

*W. P. Smith* and *O. C. Blackford,* for appellant.

1. The court's action in directing the verdict was

an invasion of the province of the jury. The issues of fact, whether or not the deceased exercised proper care for his own safety or was guilty of contributory negligence, whether he was negligent in not leaping from the speeder when he discovered the engine nearing him, instead of throwing up his hands, calling out and then continuing on down the track, whether the defendant's employees were negligent in failing to give the signals required by law, and to keep a proper lookout, etc., were questions about which the evidence was conflicting, and were for the jury's sole determination.

2. The only evidence that deceased could have gotten off the track after discovering the approach of the engine, was opinion evidence merely. It was for the jury to say whether or not he was, under the circumstances shown in evidence, negligent in not falling off of the speeder. 99 Ark. 425; 95 Ark. 94; 78 Ark. 100.

3. It was also a question for the jury whether or not the engine was on the main line at the time he placed his speeder on the track and attempted to go south, and whether, under facts developed, he exercised the degree of vigilance amounting to ordinary care for his own safety. 96 Ark. 643.

4. The burden was on the defendant to show that the constant lookout required by law was kept, and that it was not guilty of negligence in failing to stop the engine after deceased was discovered, or could have been discovered, if such lookout had been kept. 77 Ark. 10; 81 Ark. 277; 84 Ark. 248.

*E. B. Kinsworthy, Campbell & Suits* and *T. D. Crawford*, for appellee.

1. The court was right in directing the verdict. The proof shows that signals were given both at the Frisco crossing, and at the dirt road crossing near which deceased was killed, so that his getting in the way of the engine was inexcusable. It is positive that a constant lookout was being kept, and that the peril of deceased was not discovered in time to have avoided the killing.

2. If the judgment of the trial court was right, it will not be reversed, even if the reason given for such

judgment was erroneous. 73 Ark. 418. The death of
Burch was instantaneous. There was no period of con-
scious suffering. Under no view of the evidence could
the administrator recover more than nominal damages.
A case will not be reversed for error involving nominal
damages merely. 74 Ark. 358; 53 Ark. 127; 9 Cush. 108;
125 Mass. 93; 133 Mass. 507; 135 Mass. 292; 12 So. 954;
100 Pac. (Mont.) 960; 4 C. B. (N. S.) 296; 60 N. J. Law
444, 38 Atl. 759; 41 Atl. (Vt.) 652; 44 Atl. 686.

KIRBY, J., (after stating the facts). Without regard
to whether he was a trespasser or a licensee upon its
tracks, the railroad company owed the deceased the duty
to keep a constant lookout to avoid injuring him, and his
contributory negligence would not excuse its failure to
discharge this duty, where if such lookout had been kept,
his perilous position could have been discovered in time
to have prevented the injury by the exercise of ordinary
care. Acts 1911, p. 275; St. Louis, I. M. & S. Ry. Co. v.
Gibson, 107 Ark. 431, 155 S. W. (Ark.) 510.

The undisputed testimony shows that the tracks at
the place of the injury were straight and unobstructed
in any way from north of the Frisco crossing, where the
engine was placing the coaches on the switch track, to
the place where the injury occurred. A man upon the
engine keeping a lookout could have easily discovered
deceased upon the speeder on the track before running
him down.

The testimony is in conflict as to whether the wind
was blowing and it was raining at the time as the helper
said it was, making it necessary for him to keep his head
down, in order to keep his hat on, which caused his fail-
ure to see the deceased and it is also in conflict as to the
time the deceased got on the track and the distance from
the engine at the time of getting on the track, and, under
all the circumstances of the case, the jury could have
found that a proper lookout might have discovered de-
ceased's perilous position in time to have avoided injur-
ing him, by the exercise of ordinary care.

Whether, under the circumstances as detailed, the

railroad company's employees exercised that degree of care in keeping the lookout required by law, was a question properly for the jury. Several witnesses thought deceased had time to jump or fall off of the speeder and escape from the train after he discovered its near approach, but the fact remains that he did not do so, and even if he had had time he may have been so paralyzed by fright as to have been unable to do so, and, from the evidence, it appears that such was the case; but if he negligently failed to escape from the engine, that did not warrant the railway company in running him down, nor excuse its failure to keep the lookout required by law, nor its duty to avoid injuring him if it could do so by the use of ordinary care after his perilous position was, or could have been, discovered.

We are of the opinion, however, that the undisputed testimony shows that the death of the deceased was instantaneous and painless. He was virtually cut in two above the hips by the wheels of the tender and engine passing over him and only moved his head slightly and gasped after it passed over him. The physicians testified that these movements were due to muscular relaxation and contraction and the shock was complete and death painless. Such being the case, there can be no recovery for pain and suffering for the benefit of the estate and the court did not err in directing the verdict.

The judgment is affirmed.